IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff-Respondent,

v.             CIV 16-0762 WJ/KBM
             CR  15-1557 WJ

CIRILO OROZCO-SANCHEZ,

   Defendant-Movant.

## PROPOSED FINDINGS OF FACT
## AND
## RECOMMENDED DISPOSITION

  THIS MATTER comes before the Court on Cirilo Orozco-Sanchez's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 ("Section 2255 Motion"). *Doc. 23.*[1] By Order of Reference, entered July 5, 2016, this matter was referred to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of this habeas action. *Doc. 2.*

  The Court held an Evidentiary Hearing on Cirilo Orozco-Sanchez's ("Mr. Orozco-Sanchez's") Section 2255 Motion on January 12, 2018. Mr. Orozco-Sanchez was present with his counsel, James Loonam, and the court's certified staff interpreters available to provide simultaneous Spanish translation of the proceedings. Assistant United States Attorney Dustin Segovia appeared for the United States. The Court heard

---

[1] Citations to "Doc." refer to docket numbers filed in Criminal Case No. 15-1557 WJ.

testimony from both Mr. Orozco-Sanchez and his trial counsel, Margaret Strickland. Post-evidentiary hearing briefing was completed by the parties on June 7, 2018.  Having now heard testimony at the Evidentiary Hearing as well as having considered the parties' submissions, the relevant law, and the record in this case, the Court recommends that Mr. Orozco-Sanchez's Section 2255 Motion be denied.

## I.    PROCEDURAL HISTORY AND FINDINGS OF FACT

Mr. Orozco-Sanchez has significant ties to the United States, including a number of siblings living here. *Doc. 56* at 24:8-17, 25:13-15; *Doc. 55* at ¶ 35. Indeed, he came to the United States for the first time when he was 18 years old, and from then on, he lived in Dallas, Texas and Colorado Springs, Colorado, except for periods of incarceration and brief periods when he was in Mexico following deportation from the United States. *Doc. 55* at ¶ 37. During the 25-year period from 1990 to 2015, Defendant spent a mere 5 years in Mexico. *See id.* at ¶¶ 23-27, 37.

On February 2, 1998, Mr. Orozco-Sanchez was deported to Mexico for the first time after having served 45 days in jail for driving while intoxicated. *Id.* at ¶ 23. Weeks later, on February 25, 1998, he was again found to be unlawfully in the United States. *Id.* at ¶ 24. This time, he was caught transporting 16 other illegal aliens into the United States, 12 of whom were lying in the bed of the truck he was driving. *Id.* at ¶ 24. Mr. Orozco-Sanchez told Border Patrol agents that he was transporting the illegal aliens in exchange for his free passage to the United States. *Id.* After pleading guilty to alien smuggling, he was sentenced to 9 months in custody followed by a 3-year term of supervised release. *Id.* On November 25, 1998, Mr. Orozco-Sanchez was again deported to Mexico. *Id.*

Then, just over a year later on January 11, 2000, Mr. Orozco-Sanchez was again found to be unlawfully in the United States. *Id.* at ¶ 25. He pled guilty to illegal reentry in violation of 8 U.S.C. § 1326, and his supervised release was revoked. *Id.* at ¶¶ 24-25. He was sentenced to 15 months of imprisonment and 2 years of supervised release. *Id.* at ¶ 25. On February 9, 2001, he was deported to Mexico for the third time. *Id.* His term of supervised release expired on February 8, 2003. *Id.*

Ten months later, on December 14, 2003, he again returned to the United States. *Id.* at ¶ 26. His brother, Salvador Orozco-Sanchez, confirmed that he had arrived, unlawfully, in the United States in December of 2003. *Id.* at ¶ 26. Mr. Orozco-Sanchez reported working as a carpet layer for Arlun Floor Coverings & Design in Colorado Springs for all of 2004 and part of 2005. *Id.* at ¶ 44. Then, on April 16, 2005, he was discovered by law enforcement when he was stopped for a minor traffic violation and was subsequently arrested. *Id.* at ¶ 26. He was ultimately convicted of being in the United States after a previous deportation and was sentenced to 57 months of imprisonment followed by a 3-year term of supervised release. *Id.* He was deported to Mexico for the fourth time on June 11, 2009. *Id.*

A little over a year later on August 10, 2010, Mr. Orozco-Sanchez again returned to the United States. *Id.* at ¶ 27. He was discovered by Border Patrol agents hiding in the desert brush near Papago Farms, Arizona. *Id.* He was arrested and again pled guilty to unlawfully reentering the United States following a previous deportation. *Id.* This time he was sentenced to 63 months in custody, followed by a 3-year term of supervised release. *Id.* Mr. Orozco Sanchez was deported to Mexico for the fifth time on March 12, 2015. *Doc. 55* at ¶ 27.

But on March 25, 2015, less than two weeks after that fifth deportation, Mr. Orozco-Sanchez yet again returned to the United States. *Id.* at 3. He spent just nine hours in the United States before being caught by Border Patrol agents while hiding in the desert brush. *Id.* at ¶ 5; *Doc. 48-1* at 34. Mr. Orozco-Sanchez told agents that he intended to return to Colorado Springs where he planned to seek employment and reside indefinitely. *Doc. 48-1* at 56; *Doc. 56* at 30:21-31:1. Additionally, he told the agents that he did not fear "persecution or torture if he is returned to his homeland." *Doc. 48-1* at 57. A Criminal Complaint was filed against Mr. Orozco-Sanchez on March 27, 2015, charging him with illegal reentry after being convicted of an aggravated felony (i.e., alien smuggling). *Doc. 1.* The Court appointed Ms. Strickland to represent him on March 27, 2015. *Doc. 4.*

Through counsel, the United States offered Mr. Orozco-Sanchez a Fast-Track Plea Agreement. Pursuant to that Agreement, from the determined base offense level under the United States Sentencing Guidelines (U.S.S.G.), Mr. Orozco-Sanchez would receive a 3-level downward adjustment for acceptance of responsibility (U.S.S.G. § 3E1.1), as well as a 4-level downward departure (U.S.S.G. § 5K3.1), unless he was placed in Criminal History Category VI, in which case he would receive only a 2-level departure from his determined base level. *Doc. 12* at ¶¶ 4, 10, 11. The terms of the Plea Agreement prevented Mr. Orozco-Sanchez from seeking a further downward departure or variance, and he waived his right to appeal and/or collaterally attack his conviction, except on grounds of ineffective assistance of counsel. *Id.* at ¶ 7.

When Ms. Strickland discussed the possibility of a guilty plea with Mr. Orozco-Sanchez, he advised her that he had been kidnapped, held in a house for a few days,

and forced by threat of death to cross the border, along with others, in an effort to distract Border Patrol agents from couriers transporting drugs across another part of the border. *Doc. 56* at 105:24-25, 106:1, 115:17-116:12. Ms. Strickland testified that when an illegal reentry client tells the arresting Border Patrol agents that he has no fear of persecution or torture if returned, as Mr. Orozco-Sanchez did here, it raises concerns that the client will be impeached if he then attempts to assert a duress defense. *Id.* at 108:3-11.

Even so, Ms. Strickland testified that she investigated Mr. Orozco-Sanchez's duress claim by talking to some of the attorneys who represented the four other aliens who entered the United States along with Mr. Orozco-Sanchez. *Id.* at 120:15-22. She explained that none of the other defendants had related to their attorneys that they had been kidnapped and forced to cross the border. *Doc. 56* at 106:15-22. Although it was her usual practice to take notes or to request an interpreter to take notes when investigating an exculpatory defense for her clients, *id.* at 122:4-16, 125:9-11, in Mr. Orozco-Sanchez's case, her file did not contain any notes from conversations with attorneys representing the defendants who crossed the border with him, *id.* at 126:7-16. Additionally, Ms. Strickland's CJA voucher does not detail any time devoted to interviews with these other attorneys. *See Doc. 21*.

According to Ms. Strickland's testimony, she understood Mr. Orozco-Sanchez to say that he "and others" were forced to cross the border as a distraction for Border Patrol. *Doc. 56* at 116:6-12. In contrast, Mr. Orozco-Sanchez offered testimony in his supervised release violation proceeding in the District of Arizona that after being kidnapped at gunpoint in Mexico, he was forced to lead a number of people across the

border,  supposed to believe that he was their guide. *Doc. 48-1* at 24, 28, 29, 31, 32. In

that Arizona proceeding, Mr. Orozco-Sanchez testified that he did not inform the Border

Patrol agents that he crossed the border under duress because "this ha[d] happened to

me already two times and the agents don't listen." *Doc. 48-1* at 35. He elaborated,

testifying that in 1998 when he was discovered driving a truck occupied by 16 other

illegal aliens, "[t]hey got me to get in – to drive a truck by pointing a knife at me." *Doc.

48-1* at 38. Yet, Mr. Orozco-Sanchez pled guilty in his 1998 alien smuggling case and

did not object to the notation in his Presentence Report that he transported aliens in lieu

of paying a smuggling fee. *See Doc. 55* at ¶ 24, 27. In any event, Ms. Strickland was

skeptical of Mr. Orozco-Sanchez's story that he was forced to serve as a guide under

duress, and she explained that she did not want him to testify to these purported

circumstances of his reentry into the United States under oath. *Doc. 56* at 97:9-21.

     Ms. Strickland was aware that Mr. Orozco-Sanchez had the following prior

convictions: a 1998 conviction for transporting illegal aliens; a 2000 conviction for illegal

reentry; a 2005 conviction for illegal reentry; and a 2010 conviction for illegal reentry

2010. *See Doc. 48-1* at 60. Taking account of these prior convictions, she calculated

that he would receive 11 criminal history points and therefore would fall into Criminal

History Category V. *See id.* Given her calculations, she determined that Mr. Orozco-

Sanchez would receive a 12-offense-level increase from 8 to 20, pursuant to U.S.S.G.

§ 2L1.2(b)(1)(A). *See id.* Finally, she determined that, under the terms of his Plea

Agreement, he would be eligible for a 3-level reduction for acceptance of responsibility

pursuant to U.S.S.G. § 3E1.1 as well as a 4-level reduction pursuant to U.S.S.G.

§ 5K3.1 *Compare Doc. 12* at ¶ 4(e) *with Doc. 48-1* at 60.

At the Evidentiary Hearing, Ms. Strickland admitted that she erroneously calculated Mr. Orozco-Sanchez's guideline range to be 30 to 37 months incarceration. *Doc. 56* at 56:5-13, 58: 20-25, 65:19-22, 67:3-10. She testified that she was not sure whether her miscalculations were a product of her being unaware that he had violated his supervised release in his 1998 alien transportation conviction or whether she simply failed to correctly add up his period of incarceration for that offense. *Id.* at 69:2-10, 70:1-7. She conceded, however, that she should have calculated Mr. Orozco-Sanchez's guideline range to be 63 to 78 months. *Id.* at 67-68. She further acknowledged that by conveying her miscalculation to Mr. Orozco-Sanchez, she did not adequately advise him of the consequences of his guilty plea. *Id.* at 96:25-97:1-4.

She likewise admitted that she should have more thoroughly investigated his 1998 alien transportation conviction before advising him concerning the Plea Agreement. *Id.* at 75:9-15, 91:6-13. For instance, she acknowledged that prior to advising him regarding the fast-track plea offer, she could have, and should have, discovered that he received a concurrent 148-day prison term for violating his Texas supervised release. *Id.* at 71:1-16, 76:15-17, 91:6-13.

Mr. Orozco-Sanchez testified that before he entered the Plea Agreement, Ms. Strickland told him that his sentence would be 30 to 37 months with the Plea Agreement and 77 to 96 months without it. *Id.* at 10:19-21, 13:12-14, 42:16-20. Ms. Strickland insists that she clarified for Mr. Orozco-Sanchez that the 30- to 37-month guideline range was an estimate and not a promise of a sentence within that range. *Id.* at 57:9-12, 110:4-9. Ultimately, with the advice of counsel, Mr. Orozco-Sanchez entered into the Fast-Track Plea Agreement on April 30, 2015. *Doc. 12*. By signing the Agreement, he

7

admitted that he "knowingly and voluntarily reentered the United States after previously having been deported." *Id.* at 6.

At his Plea Hearing before the Honorable Lourdes A. Martinez, Mr. Orozco-Sanchez pled guilty, with the benefit of the Plea Agreement, to reentering the United States without permission after previously being deported, excluded and removed, in violation of 8 U.S.C. § 1326(a) and (b). After he was placed under oath, Judge Martinez confirmed that: (1) he read or was read his plea agreement; (2) he discussed his plea agreement with his attorney; (3) his attorney answered all of his questions to his satisfaction; (4) he signed the plea agreement voluntarily; and (5) he "fully and completely underst[oo]d each and every provision of [the] plea agreement." *Doc. 29* at 25-27. When asked later at the January 12, 2018 Evidentiary Hearing whether his entire Plea Agreement was read to him in Spanish, however, Mr. Orozco-Sanchez initially testified that it was not. *Doc. 56* at 43:24-44:1. Thereafter, counsel for the United States asked Mr. Orozco-Sanchez whether he was lying during his Plea Hearing or during his testimony at the Evidentiary Hearing. *Id.* at 49:15-16. Mr. Orozco-Sanchez responded: "No. I'm sorry I hadn't understood the other question. Yes, it was read to me in Spanish." *Id.* at 49:17-18.

At the Plea Hearing, Judge Martinez took eight defendants as a group but personally addressing each one and explained that it would be up to the sentencing judge to sentence each of them after receiving their presentence reports. *Doc. 29* at 6:21-25. She cautioned: "You also need to understand that your attorney is estimating where your attorney thinks your case will fit within those guidelines and because it is an estimate, it is possible for your sentencing judge to perhaps give you a harsher

[sentence] than your attorney thinks you're going to get right now." *Id.* at 1-5. Judge

Martinez asked each defendant whether they understood that there was "a possibility of

[the] sentencing judge perhaps giving [them] a harsher sentence than [their] attorney

thinks [they're] going to get right now." *Id.* at 18-21. Mr. Orozco-Sanchez indicated that

he understood. *Id.* at 25:4. She also asked each defendant whether he wanted to

proceed with a guilty plea, knowing that he might get a harsher sentence than his

attorney thought he would receive. *Id.* at 25:5-7. Mr. Orozco-Sanchez responded that he

wished to proceed with a guilty plea. *Doc. 29* at 25:15.

Judge Martinez asked the attorneys for the eight defendants to "describe the

essential terms" of their plea agreements. *Id.* at 28:2-6. When it was Ms. Strickland's

turn to outline the essential terms of Mr. Orozco-Sanchez's Plea Agreement, she

explained that "[b]ecause of Mr. Orozco's criminal history, he's in Category V and it

carries an enhancement for a very old trafficking case which put him beginning at Level

20." *Id.* at 38:21-24. She went on:

> He is going to receive a seven-level reduction under this offer down to
> a Level 13. That puts his range down from 63 to 78 months down to 30
> to 37 months. So it's a significant reduction. On his last prior reentry,
> he received 63 months. So he'd be receiving quite a reduction in the
> sentencing range.

*Id.* at 38:25-39:4. Judge Martinez responded:

> That's not a bad deal given your criminal history. Do you understand
> what your attorney has just explained about your prior criminal history
> and how it affects your sentence? There is a 12-level enhancement
> because of a prior crime you committed . . . And without your plea
> agreement, you'd be looking at 63 to 78 months, with this plea
> agreement, 30 to 37 months. Do you understand?

*Id.* at 39:5-13. Mr. Orozco-Sanchez indicated that this was his understanding. *Id.* at

39:10. Thereafter, Judge Martinez accepted Mr. Orozco-Sanchez's plea, adjudged him

guilty, and deferred acceptance of the Plea Agreement until sentencing by a District Judge. *Doc. 14.*

The United States Probation Office prepared a Presentence Report and disclosed it to Mr. Orozco-Sanchez on May 28, 2015. *Doc. 55* at 1. In contrast to Ms. Strickland's calculations, the Presentence Report determined that Mr. Orozco-Sanchez was facing an imprisonment range under the Sentencing Guidelines of 63 to 78 months. *Id.* According to Ms. Strickland, Mr. Orozco-Sanchez became "very upset" when she disclosed the Presentence Report guideline range to him over the phone. *Doc. 56* at 95:1-2. Ms. Strickland testified that she laid out different options for Mr. Orozco-Sanchez, including putting off the sentencing hearing, withdrawing the plea and trying to get a better plea, or pleading straight-up and asking for a departure or variance. *Id.* at 95:2-6. She indicated that she did not think Mr. Orozco-Sanchez had a "good shot" at receiving a better plea agreement. *Id.* at 86:13-16. Moreover, she believed it would be "difficult" for him to obtain a departure or variance. *Id.* at 86:15-17. She advised Mr. Orozco-Sanchez that she "really felt like withdrawing the plea and going straight-up would not be wise." *Id.* at 103:1-2. She also explained that she "didn't want to do anything to violate the Plea Agreement[,] . . . by asking to step outside sentencing ranges." *Id.* at 87:5-11. Further, Ms. Strickland was concerned that advancing arguments that Mr. Orozco-Sanchez's criminal history was overstated or overrepresented as a result of his 17-year-old conviction would serve to "highlight [his] criminal history." *Id.* at 88:2-8. She explained that she did not always get the "best result" in cases in which she "discuss[ed] criminal history at length" as opposed to devoting her time to talking about the "client and why they should get certain things in

sentencing." *Id.* at 13-19. However, Ms. Strickland testified that she did not discuss with Mr. Orozco-Sanchez the potential argument that his criminal history category was overrepresented. *Id.* at 89.

Mr. Orozco-Sanchez's testimony regarding that phone conversation differed in one significant way from that of Ms. Strickland. He testified that Ms. Strickland did not advise him that his Plea Agreement would prohibit Judge Johnson from sentencing him to less than 63 months. *Id.* at 19:20-23. He insisted that had she done so, he would have withdrawn from the Plea Agreement, even if the low end of his applicable sentencing range increased to 77 months, so that he could request a below-guideline sentence. *Id.* at 20:3-13.

Mr. Orozco-Sanchez proceeded to sentencing on June 23, 2015, before the Honorable William P. Johnson. *Doc. 16.* Mr. Orozco-Sanchez did not make any objections to the Presentence Report, through counsel or otherwise, nor did he move to withdraw his guilty plea. *Doc. 86* at 18-20; *see also Doc. 28.* At sentencing, the prosecutor recommended a sentence at the low end of the guideline range. *Doc. 28* at 2. Ms. Strickland, in turn, requested a 63-month prison sentence, making the following arguments on Mr. Orozco-Sanchez's behalf:

> [L]ike many people who come over here, my client originally came over to put himself and his family ahead. Obviously he has some run-in [sic] with the law while he has been in this county. As I'm sure the Court saw in his presentence report, he suffered some severe childhood abuse and neglect which affected the way – affected his development and his ability to make decisions. In this case, he does have an imperfect duress defense that I know he wants to discuss with the Court.

*Id.* at 3. Mr. Orozco-Sanchez detailed the circumstances of his arrest, including being kidnapped and forced to cross the border, without participation from Ms. Strickland. *Id.*

at 3-4. He asserted that he did not tell the Border Patrol agents about his kidnapping, because he had previously been beaten up by an agent. *Id.* at 3:22-4:2.

Judge Johnson accepted Mr. Orozco-Sanchez's guilty plea and his Plea Agreement and imposed a sentence of 72 months. *Doc. 17.* He further explained that "on individuals who are in Category 6, the highest Criminal History Category, [he is] generally not inclined to go with the low end of the guideline sentence." *Doc. 28* at 2:20-24. Judge Johnson finally advised, "pursuant to the plea agreement, the Defendant waives the right to appeal the sentence." *Doc. 28* at 8:7-8.

Following the sentencing hearing, Ms. Strickland spoke with Mr. Orozco-Sanchez briefly. Mr. Orozco-Sanchez testified that while he was still standing at the podium with Ms. Strickland, he "told her if she would be able to make – to appeal for me." *Doc. 56* at 21:7-8. Mr. Orozco-Sanchez explained that Ms. Strickland did not respond to his request. *Id.* at 21:9-10. He admitted that he did not know whether she heard the request, explaining that "she was taking these [interpreter] headsets, she was taking them as I was telling her." *Id.* at 21:20-22. Ms. Strickland confirmed that she frequently takes off her Spanish-speaking clients' headphones once the hearing is concluded. *Id.* at 99:1-3. She also indicated that she speaks only a "little bit" of Spanish and that she "always use[s] the services of an interpreter because [she is] not in any way competent to talk about legal issues [in Spanish]." *Id.* at 99:9-18. She did not, however, have any recollection of Mr. Orozco-Sanchez requesting that she file an appeal. *Id.* at 98:10-12, 99:6-8, 114:1-3. Mr. Orozco-Sanchez understood that he had 14 days within which to appeal. *Id.* at 21:14-17. Yet, at no time during those 14 days did he correspond with Ms. Strickland – by e-mail, phone call, or letter – to request that she file an appeal on his

behalf. *Id.* at 114:1-16. Ms. Strickland testified that if Mr. Orozco-Sanchez had even hinted about the possibility of an appeal, she would have filed one. *Id.* at 114:17-20.

Following his sentencing in this District, Mr. Orozco-Sanchez was transferred to the District of Arizona, where he was sentenced for a supervised release violation. *See Doc. 48-1.* Ms. Strickland testified that she knew Arizona authorities had initiated supervised release violation proceedings against him. *Doc. 56* at 75:16-22. At that time, it was her understanding from talking to someone associated with the case that the District of Arizona case would *not* be transferred to the District of New Mexico. *Id.* at 82:1-14. She testified that she considered this unusual and that in "almost all the cases where [there is] a supervised release violation, it is transferred to New Mexico." *Id.* at 93:1-6; *see also Doc. 56* at 82:1-14.

Contrary to Ms. Strickland's understanding, the District of Arizona entered an Order Transferring Jurisdiction to the District of New Mexico a week before the sentencing hearing on June 16, 2015. *See Doc. 54-2*, Plaintiff's Ex. 1. However, Part 2 of the "Transfer of Jurisdiction" was never completed – the Order Accepting Jurisdiction was never signed or entered by a district judge for the District of New Mexico. *See id.* At the January 12, 2018 Evidentiary Hearing, this Court noted that, based on its experience, "[g]enerally when we have a transferred violation of supervised release, that sentence is run concurrent to the underlying charge." *Doc. 56* at 80:13-16.

Mr. Orozco-Sanchez testified that Ms. Strickland did *not* advise him that he would face a separate sentence in the District of Arizona for the violation of his supervised release upon pleading guilty in New Mexico. *Id.* at 14-18. Ms. Strickland, however, insisted that she *did* so advise him. *Id.* at 78:6-14. Nevertheless, Ms. Strickland

conceded that she should have taken steps to investigate and to advise Mr. Orozco-Sanchez as to her estimate of the length of his sentence in the District of Arizona upon pleading guilty in New Mexico. *Id.* at 91:24-92:3.

Mr. Orozco-Sanchez's attorney in the District of Arizona proceeding presented testimony from Mr. Orozco-Sanchez that he was terrorized into crossing the border. *Doc. 48*, 4-5, Attach. B at 7-25. According to counsel, Mr. Orozco-Sanchez's guideline range for the District of Arizona violation was 18 to 24 months. *See Doc. 48*. The District of Arizona imposed a two-month prison term to run consecutively to the District of New Mexico sentence. *Doc. 48*, Attach. G.

On June 30, 2016, Mr. Orozco-Sanchez filed this Section 2255 Motion and asserted various claims, including ineffective assistance of counsel based upon Ms. Strickland's inaccurate guideline calculations and her failure to file a timely notice of appeal. *Doc. 23*. At the January 12, 2018 Evidentiary Hearing, Mr. Orozco-Sanchez formally withdrew all claims other than these two ineffective assistance of counsel claims. *Doc. 54*; *Doc. 56* at 5:17-25.

I. **Legal Standard**

To prevail on a claim of ineffective assistance of counsel, a Section 2255 movant must establish that: (1) trial counsel "made errors so serious that counsel was not functioning as the counsel guaranteed to the defendant by the Sixth Amendment," *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and (2) the defendant was prejudiced thereby, i.e., "that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 684.

When a lawyer disregards specific instructions from her client to file a notice of appeal, she "acts in a manner that is professionally unreasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). The disregard of instructions to file a notice of appeal is also "presumptively prejudicial." *United States v. Snitz*, 342 F.3d 1154, 1155-56 (10th Cir. 2003). That is, a movant who demonstrates that his counsel was ineffective by failing to file a timely notice of appeal need not show that the appeal was likely to succeed. *United States v. Guerrero*, 488 F.3d 1313, 1315 (10th Cir. 2007).

## II.   Discussion

At the January 12, 2018 Evidentiary Hearing, the main issues to be resolved were: (1) whether Ms. Strickland's representation of Mr. Orozco-Sanchez was ineffective at the time he entered his Plea Agreement and pled guilty; (2) whether Mr. Orozco-Sanchez was prejudiced by such ineffective assistance; and (3) whether Ms. Strickland's representation was ineffective when she failed to file a notice of appeal on Mr. Orozco-Sanchez's behalf or to consult with him regarding the possibility of an appeal.

### A.  Ms. Strickland's Improper Guideline Calculations

#### i.   Whether Ms. Strickland's representation of Mr. Orozco-Sanchez at the time he entered his Plea Agreement and pled guilty fell below the objective standard of reasonableness required by *Strickland*.

In order for Mr. Orozco-Sanchez to prevail on his Section 2255 Motion with respect to Ms. Strickland's guideline calculations, he must demonstrate that she failed to render "reasonably effective assistance" and that her incompetent performance prejudiced him. *See Strickland*, 466 U.S. at 687. Counsel's representation is ineffective when it falls below objective standards of "reasonableness under the prevailing

professional norms." *Id.* at 688. Under this standard, counsel must advise her client of the advantages and disadvantages of a plea agreement. *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010). Basically, Ms. Strickland was required to research the relevant facts regarding Mr. Orozco-Sanchez's prior record, apply those facts to the Sentencing Guidelines, and reasonably advise him about the plea consequences.

There is no dispute that Ms. Strickland erroneously calculated Mr. Orozco-Sanchez's guideline range at 30 to 37 months. She testified that she was unsure whether her guideline-range miscalculation was a product of her ignorance of a 148-day supervised-release-violation sentence or a simple failure to correctly summate his period of incarceration. Either way, she conceded that her performance was deficient. She testified that she did not adequately advise Mr. Orozco-Sanchez of the consequences of his guilty plea and that she should have, but did not, thoroughly investigate his 1998 alien smuggling conviction.

The Court's understanding of the proper arithmetic for purposes of Mr. Orozco-Sanchez's guidelines calculations is as follows. He was sentenced to nine months incarceration plus three years of supervised release in his 1998 alien smuggling case. When he violated his supervised release, he received a time-served sentence, which brought his total sentence to 13 months and 28 days. Pursuant to U.S.S.G. § 4A1.2(e)(1), a sentence, including a sentence on revocation of supervised release, of more than 13 months incarceration within 15 years of the instant conviction receives criminal history points. That is, Orozco-Sanchez received an additional three criminal history points from the 1998 alien smuggling conviction when the supervised release violation sentence is taken into account.

Additionally, because the alien smuggling offense *did* receive criminal history points, contrary to Ms. Strickland's initial understanding, *see Doc. 56* at 69, Mr. Orozco-Sanchez's base offense level was increased by 16 levels, rather than 12, under U.S.S.G. § 2L1.2(b)(1)(A). A proper calculation of Mr. Orozco-Sanchez's criminal history points put him in Criminal History Category VI, rather than Category V, which, under the terms of his Plea Agreement only gave him a 2-level reduction from the base offense level, rather than the 4-level reduction that Ms. Strickland had anticipated. Ultimately, Mr. Orozco-Sanchez's proper guidelines range with the Plea Agreement was 63 to 78 months, rather than the 30 to 37 months.[2]

Mr. Orozco-Sanchez cites persuasive authority in support of his position that Ms. Strickland unreasonably failed to investigate his sentence for violating supervised release in his 1998 alien smuggling case. *See Doc. 58* at 13 (citing *United States v. Herrera*, 412 F.3d 577 (5th Cir. 2005); *United States v. Russell*, 221 F. 3d 615 (4th Cir. 2000)). The rationale of the courts in these cases is instructive.

First, in *Herrera*, the Fifth Circuit noted that "[o]ne of the most important duties of an attorney representing a criminal defendant is advising the defendant about whether he should plead guilty," which, the court explained, counsel does by informing him about the likely consequences of a plea, including exposure under the sentencing guidelines. *Herrera*, 412 F.3d at 580. There, defense counsel estimated that the defendant would face a 51-month maximum guideline sentence if convicted, when in reality, he faced a

---

[2] Exhibit 1 to the Clerk's Minutes from the January 12, 2018 Evidentiary Hearing *(attached to this PF&RD)* is a chart comparing Ms. Strickland's guideline calculations, as reflected in the handwritten calculations contained in her file, with the proper guideline calculations. At the Evidentiary Hearing, counsel for both parties and Ms. Strickland indicated that this chart was an accurate reflection of both Ms. Strickland's calculations and the actual proper calculations. *See Doc. 56* at 6:21-25, 7:15-18, 55:23-56:1.

sentencing range of 78 to 97 months. *Id.* at 579. Because "the precise advice of counsel was essential to deciding whether to accept the Government's plea offer," the Fifth Circuit determined that defense counsel's performance fell below an objective standard of reasonableness. *Id.* at 580-581. Similarly, in *Russell*, the Fourth Circuit found "defense counsel's failure to confirm the status of two of [the defendant's] prior convictions to be unreasonable" under *Strickland. Russell*, 221 F. 3d at 621. The court emphasized that the "necessary investigation was minimal," requiring only a simple check of court records, and that the accurate portrayal of the defendant's criminal record was critical. *Id.* at 621.

Here, Mr. Orozco-Sanchez insists that Ms. Strickland should have known that his 2000 illegal reentry conviction violated his 1998 supervised release conditions and that a sentence for that violation, if only for just over four months, would have resulted in significant guideline enhancements in the instant case. He submits that no reasonable attorney would have failed to investigate the revocation sentence given its dramatic guideline-range effect. Further, he notes that a simple PACER check of the Texas federal court docket would have revealed that he received a sentence of time-served for 148 days. Notably, competent representation of a defendant at the plea negotiation stage requires research of the facts relevant to the defendant's criminal history. *See Herrera*, 412 F.3d at 580.

The United States maintains that Ms. Strickland did *not* provide ineffective assistance to Mr. Orozco-Sanchez despite her miscalculations. It submits that an erroneous sentence estimate does not render a plea involuntary or legal assistance defective, citing a handful of Tenth Circuit cases: *United States v. Hawkins*, 429 F.

App'x 791, 794 (10th Cir. 2011) (holding that the defendant was not denied effective assistance when trial counsel allegedly informed him that there was a chance he would not qualify as a career offender); *Braun v. Ward*, 190 F.3d 1181, 1190 (10th Cir. 1999) (determining that the petitioner's plea was voluntary, where the evidence refuted his contention that his attorneys misled him into believing that the sentencing judge would give him a sentence less than death); *United States v. Gordon*, 4 F.3d 1567 (10th Cir. 1993) ("Defendant has failed to show that original counsel's failure to predict the relevant conduct inclusion in his offense level constituted ineffective assistance of counsel entitling him to relief."); *Wellnitz v. Page*, 420 F.2d 935, 936 (10th Cir. 1970) ("An erroneous sentence estimate by defense counsel does not render a plea involuntary.").

Taken together, the Court agrees that the cases relied upon by the United States stand for the proposition that an erroneous sentence estimate does not *always* render the assistance of counsel ineffective. Even so, there may be circumstances under which a guideline miscalculation *does* amount to constitutionally deficient performance. Two Tenth Circuit cases support this corollary proposition: *Wellnitz*, 420 F.2d 935 and *Beavers v. Saffle*, 216 F.3d 918 (10th Cir. 2000).

In *Wellnitz*, the court reasoned that an "erroneous sentence estimate by defense counsel does not render a plea involuntary"; however, it also explained that if an attorney "recklessly promises" a specific sentence, his representation may be deemed constitutionally ineffective. *Wellnitz*, 420 F.2d at 936. In *Beavers*, the defendant's attorney misinformed him regarding the amount of time that it would take for him to make parole on a state sentence for murder, estimating that it would be between 10 to

19

12 years, when it actually took an average of 22 and a half years. *Beavers*, 216 F.3d at 921. The Tenth Circuit determined that "[g]ross misadvice" regarding parole eligibility could amount to the ineffective assistance of counsel. *Id.* at 925. The court reversed the lower court's denial of the Section 2254 habeas petition and remanded for an evidentiary hearing. *Id.* at 925-26.

The Fifth Circuit's rationale in *United States v. Grammas*, 376 F.3d 433 (5th Cir. 2004), is also persuasive on this issue. There, the court determined that a Section 2255 movant established ineffective assistance of counsel where his counsel failed to realize that his prior conviction for burglary of a building was a crime of violence. *Grammas*, 376 F.3d at 437. The court held that "[b]y grossly underestimating [the defendant's] sentencing exposure . . . , counsel breache[s] his duty . . . to advise his client fully on whether a particular plea to a charge appears desirable." *Id.* at 436.  It found counsel's assistance to be below the objective standard of reasonableness required by *Strickland* and remanded for a determination as to prejudice. *Id.*

Here, basic factual research by Ms. Strickland would have revealed Mr. Orozco-Sanchez's 148-day supervised release violation sentence and alerted her that her representations to Mr. Orozco-Sanchez regarding his guideline range were inaccurate. Given the ease with which this information could have been obtained and the critical effect that it would have on Mr. Orozco-Sanchez's sentencing guideline range, the Court is not satisfied that her performance during this stage of proceedings passes constitutional muster.

But Mr. Orozco-Sanchez maintains that Ms. Strickland's performance was deficient for an additional reason: "because she communicated her miscalculation as a

sentence promise." *Doc. 58* at 13. He asserts that Ms. Strickland made a "misguided promise," in concert with Judge Martinez, that he would receive a sentence within the range of 30 to 37 months pursuant to the Plea Agreement. The United States takes issue with Mr. Orozco-Sanchez's characterization of Ms. Strickland's advice as a "promise," insisting instead that she merely offered an "estimate."

Having reviewed the transcript of the Plea Hearing, the Court finds that Ms. Strickland did represent, consistent with her understanding at the time, that Mr. Orozco-Sanchez's guideline range under his Plea Agreement was 30 to 37 months. She did not temper this statement with any caveat that she was merely estimating his sentence. In response to her representation of Mr. Orozco-Sanchez's guideline range, Judge Martinez commented that it was "not a bad deal" and asked Mr. Orozco-Sanchez whether he understood that his prior alien smuggling conviction would result in a 12-level enhancement, when in reality the conviction resulted in a 16-level enhancement. Finally, Judge Martinez expressly inquired whether Mr. Orozco-Sanchez understood that "without [his] plea agreement, [he]'d be looking at 63 to 78 months, [and] with this plea agreement, 30 to 37 months." It was with that understanding that Mr. Orozco-Sanchez pled guilty.

Reciting the language used by Ms. Strickland at the Plea Hearing (e.g., "[H]e is going to receive a seven-level reduction . . . . That puts his range down . . . to 30 to 37 months."), Mr. Orozco-Sanchez maintains that Ms. Strickland's miscalculation evolved into a definitive *promise* that he would receive a sentence between 30 and 37 months. He emphasizes that Judge Martinez, in turn, used language amounting to an assurance that he was "looking at" a range of 30 to 37 months. Mr. Orozco-Sanchez suggests that

Judge Martinez's reinforcement of counsel's misunderstanding of the proper guideline range entitled him to believe that he would be sentenced within the stated range. Ultimately, he maintains that Ms. Strickland, together with Judge Martinez, recklessly promised and unfairly held out an assurance that he would receive a sentence within the 30-37-month range, which amounted to constitutionally ineffective representation. *See Wellnitz*, 420 F.2d at 936.

Judge Martinez did at times collectively caution the defendants who participated in the grouped plea proceeding that their attorneys were "estimating" where their case would fall within the guidelines and that a sentencing judge could give a harsher sentence than the attorney thought they would get. Yet, she did not do so contemporaneously with her statements to Mr. Orozco-Sanchez concerning his *particular* guideline range. Nor did she correct Ms. Strickland's seemingly unequivocal statement that "[h]e is going to receive a seven-level reduction under this offer." In fact, she offered her own unequivocal assurance when she told him, "[t]here is a 12-level enhancement because of a prior crime that you committed." In the Court's view, the statements by Ms. Strickland and the Court indicating that Mr. Orozco-Sanchez would be in a particular guideline range effectively trump the cautionary statements that Judge Martinez offered to the collective group of defendants at the Plea Hearing.

Further, although Ms. Strickland testified that Judge Martinez typically asks attorneys to estimate the plea agreement benefits, the subjective intent of Ms. Strickland and Judge Martinez is of little consequence to the analysis. It matters instead what an objective observer in Mr. Orozco-Sanchez's position would believe based upon the colloquy that took place at the Plea Hearing. And although a

22

defendant's erroneous expectation as to his sentence does not always render his plea involuntary or constitute constitutionally defective representation, an attorney *may* render ineffective assistance when she materially misinforms a defendant about plea sentencing consequences. *See Fields v. Gibson*, 277 F.3d 1203, 1213 (10th Cir. 2002).

This case is distinguishable from the cases upon which the United States relies. For instance, in *Braun*, the Tenth Circuit found that the record made clear that the defense attorneys had *not* provided the defendant any guarantees as to whether he would receive the death penalty and that the attorneys had *not* related any such guarantees from the judge. *Braun*, 190 F.3d at 1189. According to the defendant's own testimony, he was advised by his counsel that it was preferable to go before the judge for sentencing, because a jury would give him death "for sure." *Id*. He testified that it was his attorneys' "philosophy," after a particular conversation that they shared with the judge, that the judge may not be inclined to sentence him to death. *Id*. Counsel's *prediction* that the judge may be less likely to sentence him to death than a jury is hardly analogous to counsel telling a defendant at a plea hearing, with reinforcement from the Court, that his prior criminal history placed him in a particular sentencing guideline range.

Additionally, counsel's guideline-related mistake in *Gordon* is also distinguishable. There, the defendant's attorney failed to predict that certain relevant conduct in drug crimes charged but later dismissed would nevertheless be accounted for in the defendant's offense level. *Gordon*, 4 F.3d at 1570-71. In this Court's view, determining the relevant conduct to be included in assessing a defendant's offense level is not as easily resolved as the effect of prior convictions on a defendant's criminal

history category, which, in this case, required a simple PACER check. Further, there is

no indication that counsel in *Gordon* assured the defendant, with confirmation from the

court, that the conduct in his dismissed crimes would *not* be included in offense-level

calculations, only that he failed to advise him that it could be. Moreover, at the

defendant's plea hearing the court explicitly and directly instructed the defendant that it

"can and will consider all available information including factual data relating to any

counts dismissed." *Id.* at 1571.

In addition to *Wellnitz*, where the Tenth Circuit suggested that recklessly

promising a client a specific sentence may constitute ineffective assistance of counsel,

persuasive support can also be found for a finding of ineffective assistance of counsel in

*Finch v. Vaughn*, 67 F.3d 909 (11th Cir. 1995), and *United States v. Bennett*, 588 F.

App'x 159 (3rd Cir. 2014).

In *Finch*, a state prisoner petitioned for a writ of habeas corpus, arguing that his

trial counsel's advice to plead guilty was ineffective assistance of counsel. *Finch*, 67

F.3d at 912. There, the defendant agreed to plead guilty to state charges in exchange

for a 10-year prison term to run concurrently with his previous federal sentence. *Id.* at

915. While the defendant's attorney warned him that there was some risk that the

federal government would not cooperate, he did not explain that it was "virtually certain"

that the state and federal sentences would effectively run consecutively. *Id.* at 915-16.

At sentencing, the defendant asked the state judge what he meant by "concurrent"

sentences, and the judge assured the defendant that his state sentence would be

served concurrently with his federal sentence.  *Id.* at 911. In reality, the state judge had

no authority to effectively negate a federal sentencing court's authority by ordering

concurrent sentences. *Id.* at 916. The Eleventh Circuit determined that the "advice" from defense counsel, the state in its plea agreement, *and the state court* was erroneous, and that defense counsel's representation was therefore unconstitutionally ineffective. *Id.* Ultimately, the Eleventh Circuit reversed the trial court with instructions to grant the petition for habeas relief and to allow the defendant to withdraw his plea. *Id.* at 917.

In *Bennett*, the Third Circuit granted a Section 2255 Motion in which the movant argued that trial counsel *and the court* misinformed him about his potential sentence, both erroneously applying the recidivist enhancement. *Bennett*, 588 F. App'x at 160-61. The court concluded that trial counsel was ineffective by failing to "investigate [the defendant's] record well enough to give him accurate advice" regarding his potential sentence. *Id.* at 160. Consequently, the court found that the defendant was without the facts necessary to make a sound choice regarding entering a guilty plea, and it ordered the trial court to resentence him as if he had entered an open guilty plea. *Id.* at 161.

Here, the manner in which Ms. Strickland outlined Mr. Orozco-Sanchez's erroneous guideline range at the Plea Hearing and the confirmation that she obtained from Judge Martinez was problematic. Where the unequivocal statements made to Mr. Orozco-Sanchez, a relatively unsophisticated defendant, were not tempered with contemporaneous reminders that the guideline range was a mere estimate, they amounted to promises that he would, in fact, fall into the 30-37-month guideline range. Under these unique circumstances, the Court agrees that Ms. Strickland's statements at the Plea Hearing misinforming Mr. Orozco-Sanchez as to his guideline range, when coupled with reinforcement by the Court, amount to constitutionally ineffective representation. *See Wellnitz*, 420 F.2d at 936 ("[I]f an attorney recklessly promises his

client that a specific sentence will follow upon a guilty plea, or otherwise unfairly holds

out an assurance of leniency in exchange for a confession of guilt, the question may

arise whether such assurances were coercive, or whether such representation may be

deemed constitutionally ineffective.")

### ii. Whether there is a reasonable probability that Mr. Orozco-Sanchez would have chosen to forgo the Plea Agreement had Ms. Strickland properly advised him regarding his sentencing guideline range.

A finding that Ms. Strickland's representation was constitutionally deficient does

not end the inquiry, however. Mr. Orozco-Sanchez must also demonstrate that he was

prejudiced, which requires a showing that, absent ineffective assistance of counsel, "the

result of the proceeding would have been different." *Lee v. United States*, 137 S. Ct.

1958, 1964 (2017). Mr. Orozco-Sanchez relies upon *Missouri v. Frye*, 566 U.S. 134

(2012), as the source of the applicable standard here. *See Doc. 58* at 17.

In *Frye*, the United States Supreme Court reframed the *Strickland* prejudice

standard to address the particular procedural posture at issue. Like here, the defendant

alleged ineffective assistance of counsel during plea negotiations; however, the

particular legal question presented in *Frye* was reversed. The Court considered whether

defendant was prejudiced by entering a guilty plea without an underlying plea

agreement when he could have, absent ineffective assistance, entered into an offered

plea agreement. *Id.* at 138. Despite this distinction, the analysis and the reframed

prejudice standard is helpful here.

The Court first determined that the defendant's attorney was ineffective when he

failed to communicate an earlier plea offer to the defendant. *Id.* at 147. Thus, the Court

was faced with the question of whether the defendant had been prejudiced by entering

an open guilty plea rather than entering into a plea agreement. The Court reasoned

that, in order to establish prejudice, the defendant was required to show "a reasonable

probability that the end result of the criminal process would have been more favorable

by reason of a plea to a lesser charge or a sentence of less prison time." *Id.* at 147. It

explained that it was also "necessary to show a reasonable probability neither the

prosecution nor the trial court would have prevented the offer from being accepted or

implemented." *Id.* at 148-49. In other words, the Court indicated that, in assessing

prejudice, courts must entertain how things would have played out had the defendant

pursued an alternative plea option.

Here, Mr. Orozco-Sanchez's guideline range was 63 to 78 months with the Plea

Agreement. Without the Plea Agreement his range would have been significantly higher,

as he would no longer be eligible for the 2-level reduction provided for in the Agreement

pursuant to U.S.S.G. § 5K3.1. More particularly, his sentencing guideline range would

have increased to 77 to 96 months. *Compare Doc. 12* at ¶ 4(g) (indicating that, if in

Criminal History Category VI, Mr. Orozco-Sanchez was eligible for a two-offense-level

reduction) *with* U.S. Sentencing Guidelines Manual, Sentencing Table (U.S. Sentencing

Comm'n 2014), https://www.ussc.gov/guidelines/ guidelines-archive/2014-federal-

sentencing-guidelines-manual.

Regardless, Mr. Orozco-Sanchez maintains that the more favorable plea option

was to enter a guilty plea without the benefit of a plea agreement – that is, an open

guilty plea. Indeed, he testified that had Ms. Strickland properly informed him of his

guideline range, he in fact would have elected to plead "straight up" to the indictment.

Although entering an open guilty plea would have placed him in a higher guideline

range, he insists that such a decision would have been rational in light of the departure and variance grounds he would have asserted.

Mr. Orozco-Sanchez emphasizes that the sole benefit of the Plea Agreement was the two-offense-level departure under Section 5K3.1. He outlined five grounds for a below-guideline sentence that he could have asserted at sentencing if he had entered an open guilty plea: (1) that giving his 17-year-old alien smuggling conviction criminal history points overstated the seriousness of his criminal history; (2) that adding two criminal history points for the commission of an offense while on supervised release was unfair, because U.S.S.G. § 5D1.1(c) advises against imposing supervised release when the defendant is likely to be removed after imprisonment; (3) that he had a nonviolent criminal history; (4) that he had a "strong duress and coercion argument"; and (5) that he had a difficult childhood. *See Doc. 48* at 19-23.

In this Court's assessment, Mr. Orozco-Sanchez's best argument for a below-guideline sentence in this case would have been that the seriousness of his criminal history was overstated. As he points out in his briefing, he narrowly qualified for four extra offense levels and an increase in his criminal history category because of a 17-year-old offense. Moreover, his criminal history is indeed comprised of nonviolent, nondrug, immigration offenses. But, even this argument may not have been particularly compelling to the sentencing judge. The commentary to the section of the Sentencing Guidelines that addresses downward departures provides, for example, that "[a] downward departure from the defendant's criminal history category may be warranted if . . . the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening

period." United States Sentencing Guidelines Manual § 4A1.3 cmt. n.3 (U.S. Sentencing Comm'n 2014). Mr. Orozco-Sanchez's convictions were felonies, and he was convicted of three offenses *following* his 1998 alien-smuggling conviction. Given that Mr. Orozco-Sanchez has repeatedly committed felony immigration offenses over the past 20 years, the Court considers his chances of having obtained a significantly below-guidelines variance or departure on the basis of overstated criminal history to be relatively slim.

As to his "strong duress and coercion argument," the Court agrees with the United States that such a characterization of his kidnapping claim is "rather optimistic." *See Doc. 62* at 16. Indeed, it is unlikely that the sentencing court would find plausible Mr. Orozco-Sanchez's story about being kidnapped by a stranger at a bus stop in Mexico and forced to guide a group of unwitting border-crossers into the United States in order to serve as a distraction for a cartel's drug smuggling activities. This kidnapping story is particularly implausible given Mr. Orozco-Sanchez's unrelenting attempts to enter and remain in the United States despite escalating prison sentences of 15, 57, and 63 months imprisonment. This story is made even more implausible when the Court considers Mr. Orozco-Sanchez's testimony that this was the *third* time he had been forced by a cartel's threat of violence to re-enter the United States. The fact that he pled guilty in his previous immigration cases, representing that he was voluntarily present in the United States, undermines his claim that he only crossed the border under duress from cartels.

Ms. Strickland testified that in order to investigate Mr. Orozco-Sanchez's kidnapping story she spoke with the attorneys who represented the other illegal aliens found with Mr. Orozco-Sanchez. Mr. Orozco-Sanchez, however, maintains that this

testimony by Ms. Strickland concerning her investigation of his claim demonstrates "questionable credibility." *Doc. 41* at 8. There may be some validity to Mr. Orozco-Sanchez's suspicion that Ms. Strickland did not thoroughly investigate his reported kidnapping. After all, her file contained no notes that would indicate with whom she spoke; nor did she charge any legal fees for her alleged investigation. Even so, a less-than-thorough investigation by counsel does little to alter the implausible nature of Mr. Orozco-Sanchez's kidnapping story.

Indeed, Judge Johnson, upon hearing Mr. Orozco-Sanchez's kidnapping story at sentencing, was seemingly unmoved. He remarked in response, "I can't control the circumstances in Mexico but you've been deported numerous times. You keep illegally reentering the United States. Your conduct shows that you have no respect for the laws of the United States." *Doc. 28* at 7:4-7. He declined to sentence Mr. Orozco-Sanchez at the low-end of the guideline range, despite a concession from the United States that a "low-end sentence would be sufficient." *Id.* at 2:17-19, 7:8-14.

While Mr. Orozco-Sanchez's position that his "Arizona supervised-release violation proceedings prove[s] Ms. Strickland unreasonably discounted the power of Mr. Orozco's coercion account," review of these proceedings establishes no such thing. Although Mr. Orozco-Sanchez did receive a below-guidelines sentence from the District of Arizona, the record, critically, does not reflect the court's reasons for giving such a sentence. The court could have just as easily have considered its attempted transfer of the case to the District of New Mexico to be a mitigating factor, recognizing that Mr. Orozco-Sanchez might have received a concurrent sentence had the transfer to the District of New Mexico been accomplished. Regardless, the Court agrees with the

United States that Mr. Orozco-Sanchez's below-guideline sentence in his District of Arizona revocation proceeding does not bear on the viability of his imperfect duress defense.

Given the implausibility of his imperfect duress defense, and the sentencing judge's stated inclination not to sentence at the low-end of the guideline range when a defendant is in Criminal History Category VI, Mr. Orozco-Sanchez cannot show a "reasonable probability" that the end result would have been more favorable without the Plea Agreement. Notably, even if the factors enumerated by Mr. Orozco-Sanchez contributed to a low-end guideline sentence, which the Court considers more likely than a below-guidelines sentence, Mr. Orozco-Sanchez would have still received a sentence higher than 72 months. Moreover, a low-end sentence would only shave one month off of his high-end guideline exposure with the Plea Agreement. At the same time, he would risk a high-end guideline sentence that was 18 months higher than with his Plea Agreement. Under these circumstances, the Court simply cannot say that, properly advised, Mr. Orozco-Sanchez would have entered an open guilty plea.

Mr. Orozco-Sanchez emphasizes that in assessing prejudice, the Court must consider whether he would have opted to forgo the Plea Agreement, *even if not every defendant in his position would have done so.  Doc. 58* at 17. The Court agrees that this type of individualized assessment is required by *Lee. See* 137 S. Ct. 1968-69. Although Mr. Orozco-Sanchez testified that he would have withdrawn from his Plea Agreement if he had been properly advised, the Court is unconvinced that this *post hoc* assertion is entirely credible. Indeed, the only contemporaneous evidence available suggests that he would have done otherwise.

According to Ms. Strickland, she gave Mr. Orozco-Sanchez various options when they learned, following the issuance of the Presentence Report, that his applicable guideline range was higher than she had earlier represented. One of these options was to plead straight-up to the indictment and to request a departure or variance. Ms. Strickland testified that she "felt like withdrawing the plea and going straight-up would not be wise," as she anticipated that it would be "difficult" for Mr. Orozco-Sanchez to obtain a departure or variance. Ms. Strickland testified that when given this advice, Mr. Orozco-Sanchez opted to proceed to sentencing with the Plea Agreement in place, rather than enter an open guilty plea. Although Mr. Orozco-Sanchez's decision to proceed with the Plea Agreement does not foreclose any possibility that he might have pled straight up if offered different advice by Ms. Strickland, s*ee United States v. Monie*, 858 F.3d 1029, 1032 (6th Cir. 2017), it *does* weigh against a finding of prejudice under the specific circumstances of this case.

Mr. Orozco-Sanchez insists that his decision to continue with his Plea Agreement was a product of Ms. Strickland's conflicted advice. He contends that "for her own self-interest," she had "a strong incentive to downplay any advantages to Mr. Orozco-withdrawing from the plea agreement and to play up the disadvantages of doing so." *Doc. 58* at 24. He maintains that she was not able to provide an "unbiased, honest assessment of the plea-withdrawal, open-plea choice," because it would require her to acknowledge her own ineffectiveness. *Id.* at 23. It is telling, however, that Ms. Strickland readily admitted to certain mistakes during the Evidentiary Hearing, even though it might have been against her interest. She not only acknowledged that she erroneously calculated Mr. Orozco-Sanchez's guideline range, but she also admitted that she did not

adequately advise him of the consequences of his guilty plea and that she could have, and should have, more thoroughly investigated his prior convictions before advising him regarding the Plea Agreement. Mr. Orozco-Sanchez has not established that a conflict of interest prevented Ms. Strickland from offering adequate advice as to how he should proceed in light of the guideline range contained in the Presentence Report.

Mr. Orozco-Sanchez also suggests that his "persistent raising of his kidnaping and forced reentry . . . strongly supports the conclusion that he would have opted to fight for a downward departure and/or variance had Ms. Strickland properly advised him." *Id.* at 22. He contends that "his foremost, impassioned desire has been, and is, to present the circumstances of his entering the United States due to threats to his life." *Id.* at 23.  While the Court must take account of any evidence suggesting that it was Mr. Orozco-Sanchez's foremost desire to explain the coercive circumstances of his coming to the United States, *see Lee*, 137 S. Ct. at 1961, it is noteworthy that his persistence in raising these circumstances did not extend to his exchange with Border Patrol when arrested. Rather, Mr. Orozco-Sanchez reported to Border Patrol agents that he did not fear persecution or torture if he returned to Mexico and that he was traveling to Colorado Springs to live and work there, an assertion entirely consistent with his family ties and his history. Nor did he persist in his claim that he entered the United States involuntarily when he signed his Plea Agreement, which stated, "I specifically admit and declare under penalty of perjury that . . . I knowingly and voluntarily reentered the United States after previously having been deported." *Doc. 12* at 5-6.

Additionally, Mr. Orozco-Sanchez argues that his decision to proceed to sentencing with his Plea Agreement was tainted by Ms. Strickland's failure to appreciate

the possibility that his case in the District of Arizona might be transferred to the District of New Mexico. He maintains that she "unreasonably fail[ed] to ensure [his] Arizona case was transferred to New Mexico." *Doc. 58* at 26. According to Mr. Orozco-Sanchez, if Ms. Strickland had simply waited for the transfer to take place, he "had an excellent shot at receiving a fully concurrent time for his violation." *Doc. 41* at 13. The Court acknowledged at the Evidentiary Hearing that, based on its experience, "[g]enerally when we have a transferred violation of supervised release, that sentence is run concurrent to the underlying charge." *Doc. 56* at 80:13-16. But Ms. Strickland did not have ultimate control over the transfer of the District of Arizona's supervised release violation. Instead, the transfer of a case from one district to another can only be accomplished through the actions of two district judges, one in the transferring district and the other in the receiving district. Simply put, in this case, Judge Johnson did not sign or enter the Transfer of Jurisdiction prior to Mr. Orozco-Sanchez's sentencing. Further, Ms. Strickland testified credibly that Mr. Orozco-Sanchez "wanted to go to sentencing [and that] [h]e was tired of sitting in jail and dealing with this. He was very upset about the sentencing calculations. I discussed putting it off . . . and he didn't want to do that." *Doc. 56* at 94:24-95:6. Thus, the Court cannot say that Mr. Orozco-Sanchez chose to continue with his Plea Agreement because of deficient representation by Ms. Strickland regarding the transfer of his District of Arizona case.

Next, Mr. Orozco-Sanchez contends that his decision not to withdraw from his Plea Agreement was also founded upon the "misimpression" that he could receive a sentence below the low end of the applicable guideline-range months even with his Plea Agreement in place. He testified at the Evidentiary Hearing that Ms. Strickland did not

advise him that his Plea Agreement would prohibit the sentencing judge from sentencing him to less than 63 months. Even if this is true, the Court is not convinced that a proper understanding of the limitations imposed by his Plea Agreement would have altered his decision-making. In other words, even if Mr. Orozco-Sanchez understood that the sentencing judge could not sentence him below 63 months, the benefit of a two-offense level reduction under the Plea Agreement makes it doubtful he would have attempted to withdraw from the Agreement.

Ultimately, applying the rationale of *Missouri v. Frye* in reverse – that is, considering whether the outcome of the proceeding would have been more favorable if Mr. Orozco-Sanchez declined the Fast-Track Plea Agreement and instead entered an open plea – the Court concludes that Mr. Orozco-Sanchez cannot demonstrate prejudice. He has not shown a reasonable probability that he would have chosen to forgo the Plea Agreement had Ms. Strickland properly advised him concerning his sentencing guideline range. At most, he has shown a *possibility* that he *might* have entered an open guilty plea. But given that his guideline range was significantly higher without the Plea Agreement, the Court is unconvinced that there is a reasonable *probability* he would have done so. For, had Mr. Orozco-Sanchez entered an open guilty plea, his guideline range would have increased to 77 to 96 months, and there is a significant likelihood that he would have received a sentence greater than the 72 months incarceration imposed by Judge Johnson.

**B. Ms. Strickland's Failure to File a Notice of Appeal**

Mr. Orozco-Sanchez argues that Ms. Strickland's deficient performance concerning an appeal of his sentence deprived him of his appeal right. First, he submits

that he asked Ms. Strickland to appeal on his behalf, and she failed to do so. In his

Motion to Vacate, he asserts that he "stated to Defense Counsel that if he could file and

[sic] appeal and was told that he would and as up to date petitioner has not received

nothing or any NOTICE." *Doc. 23* at 8. At the Evidentiary Hearing, he offered contrary

testimony. There, he testified that following his sentencing hearing, while he and Ms.

Strickland were still standing at the podium, he "told her if she would be able to make –

to appeal for me." According to Mr. Orozco-Sanchez, Ms. Strickland was taking off his

interpreter headphones at the time and did not respond to his request. He admitted that

he was unsure whether she heard his request. The United States submits that these

contradictory assertions impugn Mr. Orozco-Sanchez's credibility.  Moreover, it notes

that because he and Ms. Strickland required Spanish interpreters to communicate, he

"could not have and did not express a desire that defense counsel file an appeal."

*Doc. 62* at 19.

        If Ms. Strickland heard Mr. Orozco-Sanchez request that she file an appeal, it

was her obligation to do so, regardless of the appellate waiver in his Plea Agreement.

*See United States v. Garrett*, 402 F.3d 1262, 1265-67 (10th Cir. 2005). However, based

upon the evidence before it, the Court concludes that Mr. Orozco-Sanchez did not

successfully convey any request that Ms. Strickland file an appeal, even accepting his

testimony that he attempted to do so. In short, he cannot establish that Ms. Strickland

was ineffective by neglecting to follow his *attempted* request that she file an appeal.

        However, even if Ms. Strickland did not perceive any appeal request by Mr.

Orozco-Sanchez, the Court must consider whether she nevertheless had a duty to

consult with him about an appeal. While the United States Supreme Court, in *Roe v.*

*Flores-Ortega*, 528 U.S. 470, 481 (2000), suggested that the "better practice is for counsel routinely to consult with the defendant about an appeal," it expressly declined to hold "as a constitutional matter, that in every case counsel's failure to consult with the defendant about an appeal is necessarily unreasonable and therefore deficient." *Id.* at 479. Instead, a "constitutionally imposed duty to consult" about an appeal exists only where: (1) a rational defendant would want to appeal; or (2) the particular defendant reasonably demonstrated to counsel that he was interested in appealing. *Id.* at 480. The Court emphasized that *Strickland* imposes a circumstances-specific reasonableness requirement in the context of the failure to file an appeal and that a reviewing court must consider "all the information counsel knew or should have known." *Id.* at 480.  A guilty plea, for instance, is a "highly relevant factor," because "a plea both reduces the scope of potentially appealable issues and may indicate that the defendant seeks an end to judicial proceedings." *Id.*

Mr. Orozco-Sanchez entered a guilty plea with the benefit of a Plea Agreement, which, among other things, reduced his offense level and waived his right to appeal and/or collaterally attack his conviction, except on the basis of ineffective assistance of counsel. Thus, he not only reduced the scope of potentially appealable issues by not proceeding to a trial, he effectively limited his appeal prospects to a singular issue: ineffective assistance of counsel during his plea or sentencing. As noted above, upon learning that his guideline range was higher than Ms. Strickland initially represented, he still proceeded to sentencing with his Plea Agreement intact, following the advice of counsel. As a result, he retained a lower sentencing guideline range, with a two-offense level reduction owing to the Plea Agreement. Judge Johnson, after hearing Mr. Orozco-

Sanchez's telling of the circumstances of his border crossing and arrest by Border

Patrol, nevertheless handed down a sentence toward the upper end of the applicable

guideline range.

Still, Mr. Orozco-Sanchez insists that Ms. Strickland had a duty to consult with

him regarding an appeal because he had a nonfrivolous ground for appeal: an

unknowing and involuntary plea. While a nonfrivolous ground for appeal is one factor

courts consider when determining whether counsel had a duty to consult about the

possibility of an appeal, *Roe*, 528 U.S. at 480, the Court cannot say that the particular

ground for appeal identified by Mr. Orozco-Sanchez is one that a rational defendant

would be keen to pursue. In the Court's view, the risk of receiving a *higher* sentence

outweighs the slim chance that a more favorable result might be obtained through

resentencing. And although a defendant need not demonstrate that his appeal would

have been meritorious, here, the totality of circumstances suggests that a reasonable

defendant simply would not choose to pursue an appeal.

Mr. Orozco-Sanchez also maintains that he "reasonably demonstrated to Ms.

Strickland that he was interested in appealing." *Doc. 58* at 29. The Court disagrees. As

noted above, Ms. Strickland testified credibly that Mr. Orozco-Sanchez was eager to

have the proceedings behind him and did not wish to delay sentencing. Moreover, she

testified that she did not hear him request an appeal, and he admitted that he did not

know whether she heard his request. Although Mr. Orozco-Sanchez now attempts to

cast his emotional reaction to the Presentence Report's guideline range as indicative of

a desire to appeal, he falls short. That Mr. Orozco-Sanchez remained "very upset" when

sentenced to 72 months in prison simply does not equate to a reasonable

demonstration of the desire to appeal. Critically, Ms. Strickland testified that in advance of the sentencing hearing, she laid out options and offered advice to Mr. Orozco-Sanchez about how he should proceed in light of the guideline range revealed by the Presentence Report. For example, she opined that it would be "difficult" for him to obtain a departure or variance and that "withdrawing the plea and going straight-up would not be wise." To the extent that she had a duty to confer with Mr. Orozco-Sanchez regarding the possibility of withdrawing from his Plea Agreement and entering an open plea, she fulfilled that duty in advance of sentencing. The Court cannot say that her advice was unreasonable under the circumstances. Although Mr. Orozco-Sanchez was "very upset," he apparently resolved to follow Ms. Strickland's advice and in fact proceeded to sentencing without seeking to withdraw his plea. He offers nothing to demonstrate that he effectively communicated to Ms. Strickland a change of heart in the 14 days following his sentencing. Notably, his purported ground for appeal – an argument that his plea was involuntary such that he should be resentenced on an open guilty plea – was a course of action he had already declined to take. Simply put, Ms. Strickland's failure to consult with Mr. Orozco-Sanchez about the possibility of an appeal did not constitute deficient performance under *Strickland*.

## III.    Conclusion

For all of these reasons, the Court concludes that although Ms. Strickland's representation of Mr. Orozco-Sanchez at the time he entered his Plea Agreement and pled guilty fell below the objective standard of reasonableness required by *Strickland*, he has failed to establish prejudice. Additionally, he has failed to establish that Ms. Strickland's failure to file an appeal, or to consult him regarding the filing of an appeal,

constitutes ineffective assistance of counsel. Consequently, the Court recommends denial of Mr. Orozco-Sanchez's Section 2255 Motion.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Cirilo Orozco-Sanchez's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. 2255 (*Doc. 23*) be denied and that his claims be dismissed with prejudice.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.   If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE